CULPEPPER, Judge.
This case arises from a contract dispute between the plaintiff, Ball Marketing, Inc., and the defendant, Sooner Refining Company. The trial court rendered judgment in favor of the plaintiff and against the defendant in the amount of $210,796.06 as reimbursement for overpayment under the contract, and $3,974,994.00 in damages under the penalty clause in the contract. Defendant appeals, urging the following errors: (1) The trial court erred in its interpretation of the contract; (2) The trial court erred in failing to conclude that the pricing language of the contract is so indefinite and uncertain as to invalidate the contract; (3) The trial court erred in awarding penal damages where the pricing language of the contract was subject to different interpretations; (4) The trial court erred in awarding penal damages without inquiring as to their reasonable relationship to the damages actually incurred.
FACTS
On April 8, 1980, Ball Marketing, Inc. (hereinafter Ball), and Sooner Refining Company, Inc. (hereinafter Sooner), entered into the contract which subsequently became the subject of this litigation. Included in the various obligations assumed by the parties was a clause whereby Ball agreed to purchase from Sooner 50,000 gallons of diesel fuel per week, and Sooner agreed to provide said diesel fuel to Ball. The price of the diesel fuel was to be figured on a weekly basis according to various specified listings published in a trade journal known as PLATT’S OILGRAM PRICE REPORT (hereinafter Platt’s). The paragraph in question reads as follows:
“(2) Sooner Refining Company, Inc. does hereby contract and covenant with Ball Marketing, Inc. to supply and furnish unto Ball Marketing, Inc. for a term of five (5) years from the execution of this agreement fifty thousand (50,000) gallons of diesel fuel per day. The weekly price of this diesel shall be determined and set by the previous Friday’s Platt’s Oilgram Price Report (“Platts”). The prices shall be determined by taking “Platts” U.S. Gulf Coast Spot Waterborne diesel low or “Platts” South and East Terminatls Houston District No. 2 fuel low, whichever is lower, and subtracting two cents (2<¡¡) per gallon therefrom. The diesel is to be a good quality commercial grade with an initial boiling point not to be higher than 400 degrees Fahrenheit and end point not to exceed 690 degrees Fahrenheit with a cetane to be between 48 and 52.”
The contract further contains the following penal clause:
“All parties to this contract further covenant and agree as follows: (1) The failure of Ball Marketing, Inc. to accept, and/or Sooner Refining Company, Inc. to deliver the 50,000 gallons of diesel per day as per the specifications hereinabove, will subject the party in default to a stipulated penalty of 6$ per gallon for each gallon the party fails to accept or deliver, subject to the force majeure clause contained herein;”
Although not at issue in the present case, Ball also agreed to sell to Sooner all crude oil which Ball purchased or controlled during the five-year term of the contract. This provision is mentioned only in explanation of Sooner’s later action in withholding from amounts it owed Ball for crude, the additional amounts Sooner contended Ball owed to Sooner for diesel.
The contract was signed by Charlie Goss, as representative for Ball, and by Robert Sutton, president and representative of Sooner.
In August of 1980, some three months after the operations had begun pursuant to the contract, a pricing dispute arose between the parties. The prices were to be determined according to Platt’s price listing for “US Gulf Coast Spot Waterborne diesel low or Platt’s South and East Terminals Houston District # 2 fuel low, whichever is lower.” The dispute arose because while the latter figure was easily determinable, under the former category there was no specific “diesel low” listing in Platt’s. There were at the time of the confection of *584 the contract, two listings in Platt’s which encompassed diesel fuel. One was entitled “45 Cetane diesel” and the other was “# 2 oil.”
At the beginning of the contract, Sooner was computing the price according to the lower of South and East Terminals # 2 fuel or Gulf Coast Waterborne # 2 oil. On August 6,1980, Ball was informed by letter from Sooner’s Crowley plant manager, Landry Keller, that Sooner would begin using the 45 Cetane diesel prices as a base for pricing Ball’s diesel, rather than the # 2 oil used previously, pursuant to instructions from the Houston office. The change was protested by Mr. Goss, but to no avail.
Then in January, 1981, Platt’s discontinued listing 45 Cetane diesel as a separate category for US Gulf Coast Waterborne fuels. On April 16, 1981, Sooner notified Ball that, since 45 Cetane was no longer listed, all future pricing would be done strictly according to Platt’s South and East Terminals Houston District # 2 fuel. Sooner also withheld from monies due Ball for the purchase of crude oil by Sooner from Ball the amount Sooner considered Ball had underpaid on the previous week’s delivery of diesel due to computation of the price according to the # 2 oil listing. Ball protested these actions by Sooner and demanded full payment for the crude oil it was selling to Sooner.
Sooner failed to meet Ball’s demand, and Ball filed suit for declaratory judgment and specific performance on May 6, 1981, which was met with a reconventional demand by Sooner. Ball later amended its petition to request damages for breach of contract.
On July 21, 1981, Sooner notified Ball that it would no longer purchase crude oil under the contract, inasmuch as it considered that the contract merely gave Sooner an option on Ball’s crude. Sooner also stopped delivering diesel to Ball as per the contract the last week of August of 1981.
After the taking of evidence, the trial court concluded that the provision concerning determination of the price of the diesel was ambiguous. It further held that the preponderance of the .evidence showed that the parties to the contract intended that the pricing category to be used was that of # 2 oil under the sub-heading of US Gulf Coast Waterborne. The court also found that Sooner breached the contract, and that the provisions of the penalty clause agreed upon by the parties were applicable. It therefore awarded 6<p per gallon for each gallon of diesel that Sooner failed to deliver to Ball for the remaining portion of the five-year term of the contract.
The trial judge therefore rendered an award in favor of Ball and against Sooner in the amount of $210,796.05 in actual damages for overcharges for the diesel fuel, and in the amount of $3,974,994.00 in penal damages.
Sooner appeals devolutively from this judgment.
INTERPRETATION OF THE CONTRACT
The appellant maintains the trial court’s decision that the parties intended the term “Platt’s US Gulf Coast Spot Waternorne diesel low” to refer to Platt’s # 2 oil was erroneous. Sooner argues the parties intended to use Platt’s 45 Cetane diesel price, since they used the term “diesel.” We affirm the trial court’s holding.
LSA-C.C. article 1950 provides:
“When there is anything doubtful in agreements, we must endeavor to ascertain what was the common intention of the parties, rather than to adhere to the literal sense of the terms.”
The Civil Code also provides in articles 1946 and 1947 two general rules of construction of contracts:
“Art. 1946 The words of a contract are to be understood, like those of a law, in the common and usual signification, without attending so much to grammatical rules, as to general and popular use.” “Art. 1947 Terms of art or technical phrases are to be interpreted according to their received meaning with those who profess the art or profession to which they belong.”
*585 The evidence shows that the trial court’s conclusion on this issue was correct. Charles Goss, who signed the contract for Ball Marketing, testified that he intended the price to be computed on the basis of # 2 oil, and that he and Robert Sutton, who negotiated the contract for Sooner, used the terms “diesel” and “ # 2 oil” interchangeably. For the first three months of the contract, the price was computed according to the price of Waterborne # 2 oil. It was only after Larry Sutton of Sooner began supervising the invoicing by the Crowley office that pricing was computed according to 45 Cetane diesel. The term Cetane with regard to diesel is comparable to the octane rating of gasoline and basically indicates the quality of the diesel. The contract specified that the diesel was to be within the range of 48 to 52 Cetane, and Larry Sutton testified that he felt the 45 Cetane price should be used because it was closest to that specified by the contract.
Mr. Goss testified that the specification of a 48 to 52 Cetane rating was simply to insure that he would continue to be supplied with the same quality diesel he had been receiving from Sooner in the past. It had nothing to do with the price and method specified in the contract.
Two experts testified that the # 2 oil category also included diesel with any Ce-tane rating, although it normally included diesel fuels with lower Cetane ratings. They stated that all diesel is classified as a # 2 fuel but not all # 2 fuels are diesel fuel because of variations in flash point and boiling point. A fuel may only be classified as diesel if it has the proper boiling point and flash point. They also testified that the two terms are used interchangeably.
Larry Sutton testified for Sooner, but stated that he had nothing to do with the confection of the contract. Mr. Robert Sutton, who negotiated the contract for Sooner, did not testify at the trial.
We find, as did the trial court, that the evidence preponderates in favor of the conclusion that the intention of the parties was that the US Gulf Coast Spot Waterborne # 2 oil listing would be used in computation of the price of the diesel. We therefore conclude that Ball was entitled to receive from Sooner the amount it paid in overcharges as a result of Sooner’s erroneous computation.
The appellant further argues in the alternative that the price language in the contract is so uncertain as to invalidate the contract. However, we feel that the evidence shows the intent of the parties was sufficiently definite with respect to the manner in which the price was to be computed. Therefore, the three requisites for a valid sale, i.e., price, object and consent, are met. See LSA-C.C. article 2439.
PENAL DAMAGES
The appellant argues that the trial court erred in awarding penal damages where the contract was susceptible of two different interpretations, and without inquiring into the reasonable relationship to the damages actually incurred.
The Louisiana Civil Code defines a penal clause as compensation for the damages which the creditor sustains by the non-execution of the principal obligation. See LSA-C.C. article 2125. The purpose of a penal obligation is stated in LSA-C.C. article 2117:
“Art. 2117 A penal clause is a secondary obligation, entered into for the purpose of enforcing the performance of a primary obligation.”
The contract provides for a 6$ per gallon penalty should one of the parties fail to accept or deliver the diesel as required by the contract.
It is well settled that, under Louisiana law, a penal clause is synonymous with liquidated damages, and may be stipulated either for the non-execution of a contract or for mere delay in performance. Pennington v. Drews, 218 La. 258, 49 So.2d 5 (La.1949). It is further settled that where the parties have the capacity to, and do in fact, stipulate for liquidated damages, courts will not inquire whether the actual damages equaled or exceeded the agreed amount. Lama v. Manale, 218 La. 511, 50 *586 So.2d 15 (1950); Hemenway Company, Inc. v. Bartex, Inc. oí Texas, 373 So.2d 1356 (La.App. 1st Cir.1979). As the Supreme Court stated in Lama v. Manale, supra, there is no law prohibiting such a penalty provision in a contract. The appellant has pleaded no error or mistake which would militate against enforcement of the agreement into which the parties freely entered.
We recognize that LSA-C.C. article 2127 provides the penalty may be modified by the trial judge when the principal obligation has been partially executed, except in the case of contrary agreement. Also, in certain cases Louisiana courts have examined penal damages with regard to the reasonableness of their relationship to the actual damages suffered by the plaintiff. In some cases, such awards have been reduced where they were disproportionate to the actual damages suffered. However, these were cases in which unrealistic and unreasonable damages were imposed by a party with vastly superior bargaining power in an effort to prevent breach of contract. See John Jay Esthetic Salon, Inc. v. Woods, 377 So.2d 1363 (La.App. 4th Cir.1979); McCray v. Cole, 236 So.2d 863 (La.App. 3rd Cir. 1970), reversed on other grounds 259 La. 646, 251 So.2d 161 (1971); Gauthier v. Magee, 141 So.2d 837 (La.App. 4th Cir.1962).
However, in the instant case, we find no such inequalities in the bargaining power of these parties. This was an arms-length agreement in which the parties were free to stipulate at will what appears to us to be a realistic preestimate of probable damages which would be suffered in the event of a breach of the contract by either party. We therefore sustain the trial court’s award of 6$ per gallon of diesel which Sooner failed to deliver to Ball from August 21, 1981, when Sooner ceased delivery, to April 8, 1985, the termination date of the contract.
For the reasons assigned, the judgment appealed is affirmed. All costs of this appeal are assessed against the defendant-appellant.
AFFIRMED.